## J. W. CARTER v. W. O. FRITTS.

Eastern Section. March 27, 1926.

No petition for Certiorari was filed.

1. **Appeal and error. Appellate court will not weigh the evidence.**
If there is any material evidence to support the verdict it will be affirmed by the appellate court.

2. **Negligence. Evidence. Evidence held to make a case of negligence for the jury.**
In an action to recover damages for the loss of a mare struck by defendant's automobile where the evidence showed that the defendant was a mail carrier and knew the road and saw a loose horse approaching the highway at a place where he knew stock was accustomed to cross the road, and defendant did not slow down or have his car under control, held to make a case of negligence for the jury.

3. **Negligence. Party seeing a loose horse approaching the highway must anticipate that the horse is likely to try to cross the highway in front of his car.**
In an action to recover damages for the loss of a mare killed by defendant's automobile, held that ordinary prudence requires one upon seeing a loose horse approaching a highway to anticipate that it is likely to try to cross the highway.

Appeal in Error from Circuit Court, McMinn County; Hon. S. C. Brown, Judge.

Affirmed.

E. B. Madison, of Athens, for plaintiff in error.

Candler & Stewart, of Athens, for defendant in error.

SNODGRASS, J. This is an action for damages. The case originated before a justice of the peace, where plaintiff below recovered a judgment for $75 as damages.

The defendant appealed. The cause was heard before a judge and jury in the court below, where there was a verdict and judgment for the plaintiff below in the sum of $60. Plaintiff had sued for a sum under $200.

Motion for a new trial being overruled the defendant appealed to this court, and as plaintiff in error assigns the following reasons as to why the case should be reversed:

"1. Because there is no evidence to support the verdict."

"2. Because the great weight of the evidence vastly preponderates against the charge of negligence on the part of defendant and in favor of his innocence of such negligence."

"3. Because the jury deliberated and considered the alleged fact that defendant did not stop his car after its collision with the mare alleged to have been injured, and allowed such fact to influence its verdict contrary to the charge of the court, defendant below offering the affidavit of himself as to statements of jurors to sustain said ground for a new trial."

There is nothing to support this last assignment of error, or to show just what particular facts the jury did consider in making up the verdict, were it competent, if the verdict was otherwise supported, to show just what particular part of the evidence influenced them most; or, if they did consider any incompetent testimony, the record fails to show that any exception was taken to the introduction of such testimony. The affidavit of the plaintiff in error referred to as having been offered below as to what jurors said to him is not in the record, and, lastly, no reason is shown as to why, if they did, the jury may not have considered the fact that the car made no stop at all as a circumstance. The third assignment is therefore overruled.

The second assignment is not available here, under the rule that if there is any material evidence to support the verdict it will be affirmed. In other words, the jury and the court, having concurred, disposes of any question as to the weight of the evidence. The second assignment is overruled.

There remains, therefore, only the first assignment, that the verdict and judgment is not supported by the evidence.

The parties will for convenience be referred to as they were styled below.

The suit is for an injury to the plaintiff's mare, destroying her usefulness and necessitating her being killed, caused by a collision of the defendant's automobile with said mare, late in the afternoon, about the 25th of February, 1925.

The plaintiff, W. O. Fritts, is a farmer, in McMinn county, and lived about three and one-half miles from Athens, on the Decatur pike. He had been plowing this mare with a horse, and had turned out late in the afternoon on that day. The two horses had gone across the pike from his barn to a branch to drink; the pike ran between the barn and the branch, and near the house of the plaintiff. The branch was about 30 steps or 90 feet from the road. Mr. Fritts, his son Oscar and his wife all witnessed the collision and testified. Mr. Fritts proved substantially that both the horses had taken their drink at the branch, and the horse, returning, had gone on ahead of the mare and crossed the road; that the mare seemed to lag behind, but finished her drinking and started on back the little trail that led to the road, "poking" along; that the defendant, Mr. Carter, came on up the road on the left hand side coming up from the direction of Decatur, on by plaintiff's house and on towards Athens; that he saw him about 100 feet from where the stock would cross the road there at the trail, and Mr. Carter was down the road coming on toward that little crossing, and that just about the time the mare got to the road she "pearted up like," and got faster; that he thought she was going to try to beat him across the road, but they met there at the crossing place where the stock crosses; that they met there and the mare got turned around "confused like," and the car hit her and knocked her off on the side of the road under a tree, where she fell; that Carter's car kind of slewed around, and then just went right on; that he had a man in the car with him, but they never stopped, just kept on going; that the mare's leg was broken and she had to be killed. Mr. Fritts testified that she was worth $100. He viewed the collision from off up the road in a pasture lot, about thirty or forty steps from the place where the mare was hit. He said Carter was driving from 25 to 30 miles an hour, would not be positive, but that was his judgment. That just before he hit the mare he saw him reach down and get hold of something, he didn't know what it was, and it seemed to him the car got faster when he reached down, and then it hit the mare. On cross-examination he stated that there was no one with the stock; that they just went on over the road, and across the road, and down from there to the branch and came back; that is, the horse came back, but the mare was slower; that she came along slow until she got right up close to the road; that Carter was in a Ford car; that plaintiff never owned or drove a Ford car, or

any other kind of a car, but that it was his best judgment about the speed; that he was looking down the road and could see the front of the car, but the mare was sideways to where he stood; that it was about the same distance from where the mare was drinking to the road as Carter was from the place where he hit her when he first saw him coming on.

(This is not a statement as to where the mare was when he first saw Carter, as insisted by the defendant, upon which he bases an argument that they were both going slow, and the mare "pearted up" at the wrong time and got herself killed, but only indicates that she was somewhere between the drinking place and the road when Carter's car was first seen approaching.)

The son, Oscar Fritts, was standing under a tree between the barn and the road. He testified that the horse got through drinking and came on back by him and went on to the barn, but the mare lagged behind and didn't come on with him, but was not yet as far as the road when Carter's car came along, and the mare came into the road. That Mr. Carter didn't blow or check up at all, and struck the mare and knocked her off on one side of the road; that she staggered and fell under a tree on the left hand side of the road as you come toward Athens; that Carter just went on; that the mare had her left front leg broken near the ankle; they had to shoot her; that the mare was eight years old and a good work animal; that he would say Mr. Carter was going 20 to 25 miles an hour; that he had not driven or owned a Ford car, but this was his best impression.

On cross-examination he stated that when he heard the car coming he looked down the road and saw Carter coming; that he knew his car; that the mare was coming on toward him along the little way the stock used to go to water from the barn, and when she got to the road the defendant hit her; that he was on the left side of the road, the way he was coming, and that there was no car or wagon coming meeting him; that just as the mare got into the road he hit her, as stated, and kept on going.

Mrs. Fritts stated that she was standing in the door of her house when Mr. Carter passed going toward Athens, and as he got to the place where the trail or road from the watering place crosses the big road, the mare came into the road and he hit her and knocked her down; that just before he hit the mare he reached down and took hold of something, "the gas lever, I reckon," it was something, she didn't know what, and the car "kind of jumped forward like" and hit the mare, and he just went on; that he was going pretty fast, but she didn't know about the speed of cars.

On cross-examination she stated that the mare had just got into the road when she was hit; that she didn't get half way across; that

she would have had to cross the road to get to the barn where the horse was.

Under this proof we think the jury was warranted in coming to the conclusion that the defendant's negligence was the proximate cause of the injury, and that notwithstanding both the defendant and the man who accompanied him testified that he was not running over twelve miles an hour, they were authorized in accepting the judgment expressed by the others that the speed exceeded twenty miles an hour, which constituted legal negligence, and that the hitting of the mare was the proximate result of that negligence.

However, he did not have his car under control, nor, from his own testimony, was he observing a vigilant lookout. He said: "At the place where the accident occurred there is a stock road that crosses the other, Decatur pike. This road is used by the stock on that farm, going to water from the farm." He testified also that on up the road farther towards Athens there was a mud hole on the right hand side of the road; that he had "sorter shifted" to the left-hand side to drive around the mud hole; that as he got off the road for a moment, looking ahead for the mud hole, the first thing he knew the mare was right against the front of the car; that it looked to him as it happened, that the mare was trying to get across in front of him, and the hood or front of the car struck her right behind her front legs, and the fender right about her fore feet; "It was done so quick this was the best I could get it, and the car kinder turned her around, and her rear end struck the car, etc., etc."

This testimony of the defendant, we think, makes out a case of liability. He was the mail carrier. He knew this was a stock crossing used by that farm, and at the time had actually seen the mare coming. Whether or not he, being in a hurry, and not desiring to stop, stepped on the gas to beat her to the crossing, so as not to be detained by her, or whether his attention was attracted to the mud hole (a more remote consideration) to the neglect of the duty he owed to properly guard against injury to the mare, we think is immaterial, as in either event we think the negligence was his. Having seen her approaching this crossing, we think ordinary prudence would have required him to anticipate, in the one instance, that the mare was likely to do the very thing it seems she did, and the defendant does not seem to have been impressed with the thought that she might become possessed at the critical time with the same idea as to expedition which might have animated him, especially when she was following her mate.

As stated, we think that the defendant, being apprised of the liability of a collision, and having better judgment than the mare, should have had his car under proper control and have avoided the accident; that he was negligent in failing to keep a lookout, to have sounded his

horn, or to have shown himself alive to the situation. We think there is evidence to support the verdict of the jury, and the first assignment is likewise overruled.

The judgment of the lower court is affirmed, with costs against defendant.

Portrum and Thompson, JJ., concur.